**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**                       **05-CR-00070S**

**DWAYNE FAMBO,**

        **Defendant.**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━


## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. William M.
Skretny, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear
and report upon dispositive motions.


## PRELIMINARY STATEMENT

        The defendant, Dwayne Fambo ("the defendant"), is charged in a
two count indictment with having violated 21 U.S.C. § 841(a)(1). (Docket #12). The
defendant has filed a motion for the suppression of evidence and for other
miscellaneous forms of relief. (Docket #22). The government has filed a response in
opposition to the motion. (Docket #23). This Report, Recommendation and Order will
only address the defendant's motion to suppress evidence based on a suppression
hearing held by this Court on June 16 and 17, 2005.

**FACTS**

On February 15, 2005, at approximately 11:30 a.m., while on a task force stakeout involving a totally unrelated case, Special Agent Kasprzyk of the DEA received a cell phone call from a confidential source ("CS") who advised that he had observed a Lincoln Town Car parked in front of 174 Rodney Street and saw an individual in the car whom he knew as Dwayne.  (T. 59-62).[1]

Special Agent Kasprzyk knew the CS who had proven to be reliable and who had "provided information which has led to the application and the obtaining of search warrants which also has led to the acquisition of evidence."  The CS had also "provided historical information about the drug trafficking activities of several subjects in the Buffalo area, all of which had been corroborated either by [his] agency or other law enforcement agencies."  (T. 72).  Special Agent Kasprzyk did not have any information about the individual known as Dwayne prior to this call from the CS on February 15, 2005.  (T. 70-71, 102).

The phone conversation of the CS with Special Agent Kasprzyk was recorded and a transcript of that conversation was received in evidence as Government Exhibit 4.  Because this Court considers that conversation crucial to the decision and

_____

[1]  Reference is to the transcript of the suppression hearing conducted on June 16 and 17, 2005.

recommendation being made herein, it is set forth in full as follows:

CS:    HEY DALE, LISTEN CHECK THIS OUT, THERE ON
       RODNEY RIGHT NOW IS A LINCOLN TOWN CAR
       RIGHT, IT'S SILVER IT UM, THE DUDE DRIVING
       NAME IS DWAYNE.  REMEMBER I TOLD YOU
       ABOUT THE DUDE REECE WHO LIVES OVER
       THERE WHO BE SELLING DOPE?  DWAYNE
       PLUGS FROM HIM, I BET IF HE OVER THERE HE
       PLUGGING FROM HIM RIGHT NOW.  THAT'S
       REECE HOUSE WHERE THAT, WHERE THAT, BIG
       JEEP WAGONEER IS IN THE DRIVEWAY, BLACK
       ONE THAT'S REECE HOUSE AND DWAYNE
       SITTING IN THE CAR RIGHT IN FRONT AND
       REECE HAS PEOPLE COME TO HIS HOUSE AND
       PLUGS.  I BET YOU HE'S PLUGGING FROM HIM
       RIGHT NOW.

CS:    NO, NO, HE SAID, HE SAID NOT TILL LATER, NO
       HE, HE HAD SOME DOPE ON HIM.  WE WERE
       TALKING, HE HAD A LITTLE WORK ON HIM THAT
       WAS IT, HE ONLY HAD SOME DIME BAGS THAT'S
       ALL.

CS:    NO, NO (UNAUDIBLE) (sic)

CS:    YEAH. . .

CS:    NO, IT'S LIKE A SILVER, A SILVER COLOR LINCOLN, IT'S A
       DUDE NAMED DWAYNE.  HE GOT LONG HAIR .... PROBABLY
       BACK IN A PONY.

CS:    YEAH, I'M HERE

       HIS NAME IS DWAYNE, HE'S PLUGGING FROM A
       GUY REECE, HE LIVE IN A HOUSE LIKE RIGHT
       ACROSS THE STREET ON ENGLEWOOD.  A
       BLACK JEEP WAGONEER IS . . . .

CS:    HE PROBABLY, HE PROBABLY JUST PLUGGED
       FROM REECE HE LIVES RIGHT THERE ON
       RODNEY WHERE THE BLACK JEEP WRANGLER
       IS IN THE DRIVEWAY.

As a result of this information received from the CS, Special Agent Kasprzyk "radioed to [his] surveillance team to attempt to locate the silver Lincoln Town Car" and also asked that "uniformed police officers that had been previously assisting [them] on the unrelated investigation" be requested to help locate "this silver Town Car" and "to have it stopped so [they] could identify the individual in that vehicle." (T. 69, 105).

The request for assistance made by Special Agent Kasprzyk was done over a DEA radio transmission which was heard by Detectives Torre and Doctor, and Officer Wright and Special Agent Bongiovani of the DEA, all of whom were participants in the aforesaid unrelated surveillance squad. Since this Court also considers Special Agent Kasprzyk's radio transmission as heard by the officers to be critical to this case, the testimony of Detectives Torre, Doctor and Officer Wright on this issue will be substantially set forth herein.

Detective Torre testified that "Special Agent Kasprzyk advised [him] that while in the middle of this gun operation, the informant *observed* what he thought was a drug transaction, from (sic) someone he [the CS] knew and identified by first name as Dwayne. He identified him also as being in a silver Lincoln and that he *observed what he thought was a transaction*." (T. 140, 155) (emphasis added). Special Agent Kasprzyk stated that "the informant said he knows this guy, *he just got plugged*." (T. 157) (emphasis added). Detective Torre knew this to mean that the individual "just

-4-

got served some drugs."  (T. 157).

Special Agent Kasprzyk requested that Detective Torre "contact the E District lieutenant to see if she could raise a car to assist [them]."  (T. 139).  It was roughly 11:30 a.m on February 15, 2005.

NFTA Officer Wright testified that he was part of the surveillance team involved in an unrelated gun purchase and that he heard Special Agent Kasprzyk "put over DEA radio that - - information received from a CS that there was a silver Lincoln parked on Rodney Street, and that silver Lincoln was over there - - ***the driver was over there seeing the source of supply to obtain an unknown amount of narcotics.***" (T. 171-172) (emphasis added).

Detective Doctor testified that he received a radio transmission from Special Agent Kasprzyk at approximately 11:30 a.m. on February 15, 2005 wherein Kasprzyk stated "that there was a silver Lincoln parked on Rodney Street in a driveway, and that the driver - - the vehicle was still occupied by the driver, and that [they] should try to get the license plate, and that there's ***a good possibility that the person or individual over there at that house is either getting narcotics or giving narcotics***" and that this information came from a CS.  (T. 251-252) (emphasis added).

Detective Torre called Lieutenant Karen Healy of the Buffalo Police Department on his cell phone "and made the request if (sic) she could locate a marked unit in the area to assist [them]."  (T. 140).  He heard the Lieutenant request a car over the police radio and also heard a response from Officer Sanak that he could "come to the area and try to assist [them]."  (T. 140-141).  Lieutenant Healy provided a description of the Lincoln along with its license plate number, BEL 9884, to Officer Sanak.  (T. 9, 32) (*see also* Government Exhibit 1a in evidence - written transcript of Buffalo Police Department Radio Transmission, page 2).

Officer Wright and Detective Doctor, who were working together as a team, "observed a silver Lincoln parked in the parking lot" in the Central Park Plaza which was not too far from Rodney Street.  (T. 173-174, 252-253).  It was unoccupied when first observed.  (T. 72).

Detective Torre had radio contact with Officer Sanak and advised him that the silver Lincoln was parked at the Central Park Plaza and gave Sanak "the description and the plate number of the car as it was given to [him]."  (T. 141).

Officer Wright and Detective Doctor observed an individual enter the silver Lincoln and drive out of the plaza and head north on Holden Street.  (T. 254).  A radio call went out that the car in question was moving away from the Central Park Plaza location.  At that point, Detective Torre advised Officer Sanak that he "wanted the car stopped for identification purposes, and that [Sanak should] be careful [because the

driver] may be armed, or just be careful with the subject."  (T. 141-142).  However,
Detective Torre admitted that he was not sure whether there were weapons in the
vehicle.  (T. 142, 157).  He also did not relay any of the CS information received from
Special Agent Kasprzyk to Officer Sanak.  (T. 156).

Officer Sanak testified that he first saw the Lincoln travelling north on
Holden while he was travelling south on Holden.  He turned around in a parking lot on
Holden and observed the Lincoln "still travelling north on Holden coming up to the
intersection of East Amherst with its left directional light on.  As [he] was pulling out of
the parking lot, [he] observ[ed] that [the defendant] failed to come to a complete stop at
the stop sign indicated there."  (T. 15-16, 33).  He was approximately 30-50 yards away
when he saw the Lincoln proceed through the stop sign.  (T. 17).  The Lincoln turned
left on East Amherst Street, and he followed it for approximately two blocks and "pulled
it over at Amherst and Parker" at 11:44 a.m. on February 15, 2005.  (T. 13, 17).

Officer Motley of the Buffalo Police Department also responded to the
aforesaid radio call for assistance and radioed that he was "right behind [Sanak]."
(Government Exhibit 1a in evidence - written transcript of Buffalo Police Department
Radio Transmission, page 2).  Officer Motley was also driving a marked Buffalo Police
patrol car.

Both Officer Wright and Detective Doctor testified that they observed the
silver Lincoln "roll through the stop sign at East Amherst and Holden." (T. 174 - 175,

255, 277-278) notwithstanding that the alignment of various vehicles on Holden at the time consisted of the following: (1) the silver Lincoln, (2) a private passenger vehicle behind the Lincoln, (3) Sanak's marked patrol car, (4) one or two private vehicles behind the marked patrol car, and (5) the Wright/Doctor vehicle which was "one hundred yards" behind the Lincoln. (T. 315 - 316).

Officer Sanak effectuated the stop of the Lincoln by turning on his flashing lights and the Lincoln immediately pulled over and Officer Sanak parked his patrol car behind and to the left of the Lincoln.  (T. 18).  Officer Sanak radioed the dispatcher that he had stopped the Lincoln (T. 17-19) but never communicated to the dispatcher or any of his fellow officers that the driver of the Lincoln had failed to stop for a stop sign. (T. 36-37) (*see also* Government Exhibit 1a  in evidence - written transcript of Buffalo Police Department Radio Transmission, page 2).  He also radioed "I got a car with me on it, I'm all set here."  (Government Exhibit 1a  in evidence - written transcript of Buffalo Police Department Radio Transmission, page 2).  The car with him was that driven by Officer Motley who had pulled his marked patrol car in front of the Lincoln. (T. 176, 256).  Sanak then proceeded to do a plate check "from the computer terminal inside [his] police vehicle" and learned that the vehicle was registered to Dwayne Fambo.  (T. 18-19, 39, 56-57).  He then exited his patrol car and approached the driver of the Lincoln and obtained the driver's license after advising him of the reason for the stop, *i.e.*, "that he failed to stop at the stop sign at Amherst and Parker (sic)."[2]  (T. 20-

---

[2]  Page 21 of the hearing transcript indicates that the witness said the stop sign was at Amherst and Parker.  This Court's hearing notes also reflected that testimony as

21, 46).  Officer Sanak "looked in the back window [and] the front window [of the

Lincoln and he] could see the entire inside of the car."  The driver "was polite, he was

courteous, but seemed a little nervous."  (T. 21).  Officer Sanak returned to his patrol

car with the driver's license in hand and ran a check on this license through his patrol

car computer. (T. 22-23).  He was not going to arrest the driver of the Lincoln for the

Vehicle and Traffic ("V & T") violation but was only going to issue a traffic citation.

(T. 41).  Officer Sanak actually wrote out a traffic violation summons charging the

defendant with having violated § 1172 of the V&T Law "Failed To Stop At Stop Sign."

(*See* Government Exhibit 3).


        After Officer Sanak pulled the Lincoln over, Wright and Doctor pulled their

car over to the curb on East Amherst and "maintain[ed] an eye on the uniformed police

officer [Sanak]" for purposes of "officer safety."  (176).  "Detective Torre and Special

Agent Bongiovanni positioned themselves behind [the Wright/Doctor] unmarked

vehicle."  (T. 257).


        Officer Wright observed Officer Sanak "talking to the driver of the silver

Lincoln; they talked for a little bit, and during the conversation [he] observed Officer

Sanak come back to the [patrol] car with [what] looked like to be (sic) a license in his

hand."  Officer Wright "approached Officer Sanak and asked if [he] could see the

---

indicated in my colloquy on page 48 of the hearing transcript.   Nevertheless, I have
concluded that the witness misspoke and that he intended to say that the alleged stop sign
violation occurred at Amherst and Holden.  *See* Government Exhibit 3, the traffic summons
and T. 15-16, 33, 47-48, 49.

driver's license of the driver of the vehicle [Lincoln]."  (T. 177).  He did view the license

and learned that the driver was Dwayne Fambo and "wrote [down] the defendant's

name, his address, date of birth."  (T. 177, 195).  At the time, Officer Sanak was in his

patrol car "running information on the defendant to his license (sic)."  (T. 177).

Detective Doctor also spoke to Officer Sanak and asked him "what [the

driver] gave him" and Sanak replied that the driver "gave him a license, and that his

name was Dwayne Fambo."  (T. 257, 288).  Thereupon, Detectives Doctor and Torre

decided "to go talk to the driver and see what's going on" with the intention of "just

ask[ing] him a few questions, see where he's coming from and what he's doing, ***try to***

***investigate a little***."  (T. 257) (emphasis added).  The purpose for this further

**"investigation" was to "determine later it could be a case for [them] later on (sic)"**

since "this was good information from a CS that [they] had and [they] wanted to act on

it."  (T. 289) (emphasis added).  They were also "**try[ing] to get some more**

**information out of [the defendant] [to] see if he was lying to them**."  (T. 288-289)

(emphasis added).

Officer Wright also "approached the driver side of the vehicle" and

"observed that he had like a black - - looked like a holster or some kind of tight weight

belt or something on his right side of his body, his right hip, and [he] asked [the driver] if

he had a weapon" to which the driver responded "no."  (T. 178).

Officer Sanak testified that while he was sitting in his patrol car writing out the traffic summons, he observed "five to six plain clothes officers who were talking with the driver, Mr. Fambo.  There was (sic) a couple officers on one side of the car" and "a couple of officers talking with him through the driver side window."  (T. 26).  The driver of the Lincoln remained seated in his vehicle, and this conversation with him by the other officers lasted for "ten, fifteen minutes."  (T. 26-27).

Detective Torre testified that he did not witness the vehicle stop made by Officer Sanak but heard "on the radio that they had the car stopped on Amherst Street near Parker."  (T. 143).  He proceeded to that location in order "to give Officer Sanak a hand if he needed it" because he "didn't want [Sanak] stopping someone by himself, and [they] wanted to talk to the driver."  (T. 143, 158).  He also was concerned about officer safety.  (T. 143).  When he arrived at the scene, he observed a marked patrol car in front of the Lincoln and Officer Sanak's patrol car which "was just east of the silver Lincoln."  Officer Sanak was seated in his patrol car and Torre "could see that [Sanak] had someone's license on his clipboard and he had a summons book out on the clipboard."  (T. 144, 159).  Although he observed that Sanak had the driver's license, Torre did not stop to look at it in order to learn the identity of the driver.  (T. 159).  Within ten minutes of his arrival, they "knew for sure who the driver was."  (T. 144-145).

Torre approached the driver of the Lincoln because "[he] wanted to talk to him about the drug transaction that was (sic) **observed**."  (T. 145) (emphasis added).

When he first approached the Lincoln, "the driver side window was just cracked open, maybe an inch, inch and a half."  The driver of the vehicle "was seated in the driver (sic) seat looking straight ahead. [Torre] asked him his name, [but] no response [given]; then [he] asked him to step out of the vehicle with no response."  (T. 145-146).  The driver would not look at him and instead, "kept staring straight ahead and made no reaction to [his] requests."  (T. 146).  The driver "had a cell phone in his left hand, although he wasn't talking on it, and his other hand was open."  (T. 146).  Torre "made requests for (sic) [the driver] to put his hands on the wheel [and] he did put his hands up on the wheel. [A]bout this time, Special Agent Kasprzyk arrived."  (T. 146).  Torre advised Kasprzyk that "the driver was not cooperating, that he wouldn't respond to [his] questions or requests."  (T. 146-147).  At that time, Torre stepped back from the Lincoln, and when he returned, the driver "was on the phone and appeared to be talking to somebody."  (T. 147).  He observed Special Agent Kasprzyk "open[ ] the driver side door, and [the driver] gave him the phone to talk to [the driver's] attorney."  (T. 147).

Special Agent Kasprzyk testified that he approached the Lincoln and asked the driver to "roll his window down and open up his door" but the driver "seemed disinterested in listening to [him]" and was talking on his cell phone to someone. Kasprzyk opened the car door and asked the driver who he was talking to on the phone, and the driver responded that he was talking to his attorney.  Kasprzyk then asked the driver to give him the phone so that he could speak to the attorney and the driver complied.  After identifying himself, Special Agent Kasprzyk "asked who (sic) was I speaking with" and the reply was, "Carl Dobozin" and that he represented the driver of

-12-

the Lincoln Town Car whom, according to Kasprzyk, he referred to as "Dwayne

Calhoun."[3]  Kasprzyk testified that he advised Dobozin that the individual in the vehicle

had been identified as Dwayne Fambo and Dobozin corrected himself and referred to

his client as Dwayne Fambo.  (T. 78-79).


Special Agent Kasprzyk further advised Mr. Dobozin of the reason for the

stop of the Lincoln, *i.e.*, a V&T violation, and that the driver had been "seen leaving an

area that is a high crime, drug trafficking area; that [the defendant] is being

uncooperative with the police and the agents."  He also explained to Mr. Dobozin that

"for officer safety reasons, [they] need [the defendant] to get out of the car and subject

himself to a pat down search so [they] can make sure he doesn't have any weapons on

him."  (T. 79).


Carl Dobozin testified that the defendant had called him at his office

around noon on February 15, 2005 and told him that "he had been stopped by the police

and that they basically wanted him to get out of the car and he asked [Dobozin] what he

should do."  Dobozin told him "that he should not under any circumstances consent to a

search of the car."  (T. 226).  According to Dobozin, this was the first call received by him

from the defendant on that day.  Approximately a minute later, the defendant called him

again, and while he was talking to the defendant, he heard another voice say, "who are

you talking to" and he heard the defendant say that he was talking to his attorney.  This

---

[3] Carl Dobozin, Esq. testified at the hearing and disputed that he referred to the
driver of the Lincoln as "Dwayne Calhoun."  (T. 235-236).

-13-

voice then asked, "who is your attorney" and the defendant replied "Carl Dobozin."  The voice then asked the defendant to allow him to talk to the attorney.  (T. 229, 236).

Mr. Dobozin advised the defendant that "there's no requirement that you talk to [the police]" and that he should not consent to a search of the car and that he should "not consent to do anything, including making statements."  (T. 234, 238, 239, 246).  He did advise the defendant to produce his identification.  (T. 234).  Mr. Dobozin also advised Special Agent Kasprzyk that he had instructed his client not to consent to a search of his vehicle and that what Special Agent Kasprzyk and the officers were doing was illegal.  (T. 233).  Mr. Dobozin testified that Special Agent Kasprzyk then started talking about "tinted windows" and "bring[ing] a dog around."  (T. 245).  Attorney Dobozin made notes of his conversation with the defendant and with Special Agent Kasprzyk.  (*See* Defendant's Exhibits 4 and 4A).

Special Agent Kasprzyk ended the call with Dobozin and returned the cell phone to the driver of the Lincoln and continued to talk to the driver in an attempt to have him exit the vehicle.

Detective Torre testified that when Special Agent Kasrpzyk opened the car door to receive the cell phone, he, Torre, noticed that the driver of the vehicle "had some kind of leather, looked like a holster to [him], protruding from his jacket.  There was definitely a bulge there and a piece of leather protruding from his jacket."  (T. 147).  Torre told the driver that he "wanted to make sure [that the driver did not] have a gun"

-14-

and "explained to him several times that [he, Torre, thought that the driver] may have a gun" and that he told him that "for officer safety, just step out of the car, let me pat you down.  If you don't have a gun, you could get your ticket and you can be on your way." (T. 147-148).  The driver did not comply with his request and had stated to Detective Torre that his "lawyer said that he [did not] have to do anything."  (T. 148).  When the defendant took his hands off the steering wheel, Detective Torre drew his weapon and told the defendant that he "want[ed] to see what [he] had" and to step out of the car. (T. 149).  The defendant responded by saying "my lawyer says I don't have to do anything."  (T. 149-150).

        "[A]fter several requests to see what [the driver] had on his side, without any acknowledgment, without even looking at [him, Torre], just kept his - - kept a firm dead-on look at the windshield, never turned to [him, Torre] Detective Torre then "made a comment to Detective Doctor let's take him out of the car" and they both reached in and grabbed one arm each and literally pried [the defendant] off the steering wheel and took him out of the car" while advising him that he was "under arrest for obstruction." (T. 150-151).

        Detective Doctor testified that numerous commands were given to the defendant "to keep his hands on the steering wheel for officer safety" and after he disobeyed the commands to keep his hands on the steering wheel," he was asked numerous times "to step out of the vehicle."  (T. 261-262).  The defendant had responded to these commands by stating that his attorney had "advis[ed] him not to get

out of the vehicle or not to let [them] search him or his vehicle." (T. 262). Detective

Doctor testified that "after attempting unsuccessfully to get [the defendant's]

cooperation, the decision was made to place him under arrest for obstruction of justice

(sic) for disobeying numerous commands to keep his hands on the wheel" because their

"biggest priority was officer safety and [they] had concern about it." (T. 263).

       The defendant was "taken out of the car and handcuffed, and then patted

down, and at that point [the officers] realized [the defendant] had a leather fanny pack

off to the side of his hip" which did not contain any weapons. (T. 152).

       According to the testimony of Detective Torre, the defendant was arrested

for "obstruction of government administration," to wit, "officer safety" in that he wanted to

know if the defendant had "a gun or not" but he did not charge the defendant with

obstruction of government administration. (T. 165, 169).

       However, Detective Doctor testified that the defendant was placed under

arrest "for disobeying commands to keep [his] hands on the steering wheel for [their]

safety" and he was charged with "obstruction of justice (sic)." (T. 263). He further

testified that he was going to charge the defendant with violating § 1172(a) of the V&T

Law, "passed stop sign" notwithstanding the fact that Officer Sanak had already

completed a traffic summons charging the defendant with that violation. (*See*

Government Exhibit 3). Detective Doctor was also going to charge the defendant with

violating § 195.05 of the Penal Law, "obstruction of governmental justice (sic);" §205.30

of the Penal Law, "resisting arrest" and § 220.16 of the Penal Law, "charge of criminal possession of a controlled substance."  (T. 270-271).  None of these charges were ever formally placed against the defendant because a decision had been made "to charge the defendant federally" because they "determined that information from the CS was enough PC, probable cause, with narcotics charge (sic)."  (T. 270-271, 291-292).

After the defendant was forcibly removed from the vehicle and placed in handcuffs, Detective Wright conducted a search of the defendant's person and found a package of suspected powder cocaine in the defendant's left pocket of his jacket. (T. 183, 264).

Detective Doctor testified that because traffic was being obstructed, he "was going to attempt to move the [defendant's] vehicle on to Parker Street until [they] had a K9 dog come to the scene."  However, when he stepped into the vehicle, the keys were not in the ignition.  As a result, he conducted a search for the keys and "lifted up the center console and found one large clear plastic bag containing two smaller bags, which (sic) each of them contained like (sic) a golf ball size white rockish substance which appeared to be crack cocaine."  At that point, a decision was made "to bring the car for safekeeping to the Buffalo Police Seneca Street garage."  (T. 266-267).  The defendant was transported to Buffalo Police Headquarters by Officer Motley.  (T. 29). The seized substances were field tested for narcotics and they tested "positive for narcotic controlled substance, cocaine."  (T. 269, 272).

-17-

Officer Sanak followed Officer Motley to Buffalo Police Headquarters and gave the V&T Summons that he had written up charging the defendant with violating § 1172(a) of the V&T Law (Government Exhibit 3) to Officer Motley.  However, this Summons was returned to him at a later date and voided on April 29, 2005 since the defendant was going to be prosecuted on federal charges.  (T. 29-30).  (*See also* the notation on Government Exhibit 3).

On February 15, 2005, the defendant was formally charged in a federal criminal complaint with having violated 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and taken into federal custody.

## DISCUSSION AND ANALYSIS

I find this case to be most troublesome for the reasons hereinafter stated. For all intents and purposes, it is practically on all fours with the case of *United States v. Swindle*, 407 F.3d 562 (2005).[4]  Notwithstanding that this Court recommended that the defendant Swindle's motion to suppress evidence be denied, and the Court of Appeals for the Second Circuit affirmed the Order of the Hon. William M. Skretny accepting said recommendation, the Court of Appeals strongly expressed its criticism of the officers' conduct in that case by labelling it "a clear abuse of police authority."  *Id.* at 569, 572.

---

[4] This Court issued a Report, Recommendation and Order dated March 11, 2003 which was accepted by the Hon. William M. Skretny in its entirety, including the authorities cited and the reasons given on May 28, 2003, which the Court of Appeals for the Second Circuit affirmed.

For purposes of discussion as to the case at bar, the relevant facts in

*Swindle* are as follows as set forth by the Second Circuit Court of Appeals in its decision:

> At the moment they ordered Swindle to stop, the officers had merely observed an unidentified black man drive up to the drug house in a Bonneville (. . .), enter the house, leave a short while later and then drive away.

*Id.* at 569.

In reviewing these facts, the Court of Appeals concluded that:

> This is not enough information on which to reasonably order a person to stop. . . .  "That on one occasion a car is parked on the street in front of a house where a fugitive resides is insufficient to create a reasonable suspicion that the car's occupants had been or are about to engage in criminal activity."  Second, Swindle's entering of a known drug house does not itself suggest that a crime was afoot.  As the Supreme Court has noted, an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also Brown v. Texas*, 443 U.S. 47, 52 (1979) (finding no reasonable suspicion where defendant was observed in alley in neighborhood known for drug dealing and where police merely claimed that situation "looked suspicious.")

*Id.* at 569

In the present case, a CS reports to S.A. Kasprzyk the following:

> CS:   HEY DALE, LISTEN CHECK THIS OUT, THERE ON RODNEY RIGHT NOW IS A LINCOLN TOWN CAR RIGHT, IT'S SILVER IT UM, THE DUDE DRIVING NAME IS DWAYNE.  REMEMBER I TOLD YOU ABOUT THE DUDE REECE WHO LIVES OVER

THERE WHO BE SELLING DOPE?  DWAYNE
PLUGS FROM HIM, *I BET* IF HE OVER THERE HE
PLUGGING FROM HIM RIGHT NOW.  THAT'S
REECE HOUSE WHERE THAT, WHERE THAT,
BIG JEEP WAGONEER IS IN THE DRIVEWAY,
BLACK ONE THAT'S REECE ONE HOUSE AND
DWAYNE SITTING IN THE CAR RIGHT IN FRONT
AND REECE HAS PEOPLE COME TO HIS HOUSE
AND PLUGS.  *I BET YOU* HE'S PLUGGING FROM
HIM RIGHT NOW.

*     *     *

CS:     NO, IT'S LIKE A SILVER, A SILVER COLOR LINCOLN, IT'S A
        DUDE NAMED DWAYNE.  HE GOT LONG HAIR .... PROBABLY
        BACK IN A PONY.


CS:     HIS NAME IS DWAYNE, HE'S PLUGGING FROM A
        GUY REECE, HE LIVE IN A HOUSE LIKE RIGHT
        ACROSS THE STREET ON ENGLEWOOD.  A
        BLACK JEEP WAGONEER IS . . . .

CS:     HE *PROBABLY*, HE *PROBABLY* JUST PLUGGED
        FROM REECE HE LIVES RIGHT THERE ON
        RODNEY WHERE THE BLACK JEEP WRANGLER
        IS IN THE DRIVEWAY.

Government Exhibit 4 (emphasis added).


        The information given by the CS to Special Agent Kasprzyk was nothing

more than rank speculation as evidenced by his use of the words "I bet" and "probably."

The CS did not report that he actually observed a drug transaction involving the

defendant.  As a result, at this point we have a mirror image of the Swindle case, *i.e.*, a

silver Lincoln Town Car being seen in front of a drug house on Rodney Street with a

person named "Dwayne" sitting in the car.  "That is not enough information on which to

reasonably order a person to stop." *Swindle, supra*.  Nevertheless, Special Agent Kasprzyk took it upon himself to do just that.  It is pointed out that Special Agent Kasprzyk is an experienced DEA agent and law enforcement person in that he has been employed as a DEA agent for 17-1/2 years, and prior to that was a police officer in Reno, Nevada for seven years.  (T. 58).  As a result, he should have known that neither probable cause nor reasonable suspicion existed at the time of the CS's report to have the silver Lincoln Town Car stopped for purposes of obtaining an "identification" of the driver.

The record clearly establishes that it was the "plan" of the task force officers, at the direction of Special Agent Kasprzyk, to have the silver Lincoln Town Car stopped in order to obtain an identification of the driver.  (T. 69, 99, 105, 141-143, 157, 189, 193, 195, 255, 279, 282, 284).

Special Agent Kasprzyk admitted on cross-examination that the CS "had no information that in fact" the defendant was at the Rodney Street location to obtain drugs.  (T. 92-93).  He further admitted that "this plan [to stop the car] was formulated before any traffic violation was observed" (T. 99, 124) and he "knew nothing about [the defendant] other than what [his] confidential informant had told [him]."  (T. 102).

The United States Supreme Court has ruled that:

> An automobile stop is thus subject to the constitutional imperative that it not be '**unreasonable**' under the circumstances.  As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.

*Whren v. United States*, 517 U.S. 806 (1996) (emphasis added).

Absent probable cause or reasonable suspicion to believe that a car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable law, "[s]topping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment."  *Delaware v. Prouse*, 440 U.S. 648, 663 (1979); S*ee also United States v. Brignoni-Ponce*, 422 U.S. 873 (1975).  The facts in the case at bar clearly and convincingly establish that Special Agent Kasprzyk's order to stop the defendant's silver Lincoln Town Car for the purpose of "identifying the driver" was an abuse of police power and was unreasonable under the circumstances that existed at the time of the order.  Furthermore, this Court has some real concerns about the beliefs that Special Agent Kasprzyk apparently has about his authority to undertake such stops.  I specifically asked him what the legal basis was that caused him to believe that he had such authority to cause the stop of the defendant's vehicle.  (T. 123-125).  Special Agent Kasprzyk failed to answer this question.  Instead, he stated:

Typically if I were talking to a uniformed police officer based on circumstances like this, I would suggest that the officer follow the person and see if he commits a traffic violation, and use that as a basis to stop him, the traffic violation, so that we could do an identification of the driver.  Now, I don't know if those instructions were given to the uniformed officer, because I myself did not talk to the uniformed officer in this case.

(T. 125)

The record is clear that Special Agent Kasprzyk made no attempt to talk to a uniformed police officer so as to give instructions "to follow the person and see if he commits a traffic violation;" nor did he attempt to convey such instructions to any of the task force officers that day.  His order was clear and unequivocal, to wit, stop the silver Lincoln Town Car "so they could identify the individual in that vehicle."  (T. 69, 105).  The task force officers who testified at the suppression hearing all stated and agreed that the "plan" was to stop the silver Lincoln Town Car in order to obtain an identification of the driver.  (T. 69, 99, 105, 141-143, 157, 189, 193, 195, 255, 279, 282, 284).

"To justify a stop, a police officer 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *United States v. Swindle, supra* at 569.

Although it is dicta, the Court of Appeals strongly expressed its view in *Swindle* by stating:

-23-

> [W]e believe that a police officer should not be empowered
> to order someone to stop unless the officer reasonably
> suspects the person of being engaged in illegal activity.
> We find this position most faithful to Terry's own
> prescription that, when stopping a suspect, a police
> "officer's action [be] justified at its inception."

*United States v. Swindle, supra* at 567.

As the Supreme Court has stated:

> In the absence of any basis for suspecting appellant of
> misconduct, the balance between the public interest and
> appellant's right to personal security and privacy tilts in
> favor of freedom from police interference.  The Texas
> statute under which appellant was stopped and required to
> identify himself is designed to advance a weighty social
> objective in large metropolitan centers: prevention of crime.
> But even assuming that purpose is served to some degree
> by stopping and demanding identification from an individual
> without any specific basis for believing he is involved in
> criminal activity, the guarantees of the Fourth Amendment
> do not allow it.  When such a stop is not based on objective
> criteria, the risk of arbitrary and abusive police practices
> exceeds tolerable limits.

*Brown v. Texas*, 443 U.S. 47, 52 (1979).

Similarly, in *City of Indianapolis v. Edward*, 531 U.S. 32 (2000), the

Supreme Court stated:

> In Prouse, we invalidated a discretionary, suspicionless
> stop for a spot check of a motorist's driver's license and
> vehicle registration.  The officer's conduct in that case was
> unconstitutional primarily on account of his exercise of
> "standardless and unconstrained discretion.  440 U.S. at
> 61."

* * *

> We suggested in Prouse that we would not credit the
> "general interest in crime control" as justification for a
> regime of suspicionless stops.  440 U.S. at 659, n. 18.

*Id.* at 39, 41.

Therefore, it is the finding of this Court that the action of Special Agent Kasprzyk in ordering a stop of the defendant's vehicle so as to identify him was a clear abuse of police power.

However, this does not cause the legal analysis of what transpired on February 15, 2005 to be completed.  This Court is well aware of the legal principles established in *California v. Hodari D*, 499 U.S. 621, 626 (1991) (seizure requires "either physical force . . . or, where that is absent, submission to authority); *Brown v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (20 mile police chase of the defendant presumed not to be a seizure); *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) ("police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment.").  As the Court of Appeals for the Second Circuit has opined, "Hodari D strongly implies - without explicitly holding - that an unreasonable order to stop does not violate the Fourth Amendment and that the grounds for a stop may thus be based on events that occur after the order to stop is given.  *See* 499 U.S. at 629." *United States v. Swindle, supra* at 568.

In the present case, the government argues that the stop of the defendant's vehicle was not based on the order of Special Agent Kasprzyk, but rather, on the fact that Officer Sanak observed a V&T violation by the defendant, to wit, the failure to stop at the intersection of Holden and East Amherst, thereby making not only the stop of the vehicle legal, but also the subsequent events that occurred after the stop.

Under "normal circumstances," I would have no problem in agreeing with the government's position as reflected in my Report, Recommendation and Order dated March 11, 2003 in *United States v. Swindle, supra*, and as affirmed by the Second Circuit Court of Appeals.  I would also have no problem in upholding the right of the officers to order the defendant to exit his vehicle after the alleged traffic violation.  *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *Maryland v. Wilson*, 579 U.S. 408, 415 (1997); *Molica v. Volher*, 229 F.3d 366, 369 (2d Cir. 2000).  Nor would I have any problem "under normal circumstances" in upholding an arrest of the defendant for a traffic violation even if it were minor in nature and made by officers who would normally not effectuate arrests for traffic violations.  *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *Arkansas v. Sullivan*, 532 U.S. 769, 771 (2001); *New York v. Class*, 475 U.S. 106, 118 (1986); *United States v. Scopo*, 19 F.3d 777, 781-782 (2d. Cir.), *cert. denied*, 513 U.S. 877 (1994). See also: Section 140.10 of the New York Criminal Procedure Law and Section 155 of the New York Vehicle and Traffic Law. It is also recognized by this Court that a defendant's claim that the officers were engaged in a "pretextual arrest," *i.e.*, an arrest for a traffic violation, is of no legal consequence in

analyzing Fourth Amendment issues such as presented herein if "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time" warranted the actions taken. *Maryland v. Macon*, 472 U.S. 463, 470-471 (1978). The question that must now be decided, is whether the actions of the agents and police officers on February 15, 2005 were legally warranted. For the reasons hereinafter stated, it is my opinion that they were not.

Although the government's argument may not necessarily be disingenuous, it certainly strikes this Court as being lubricious because I find the coincidence of an alleged traffic violation to be too convenient, especially in light of Special Agent Kasprzyk's testimony, and therefore not credible based on the totality of the circumstances that existed at the time of the stop of the vehicle, and the testimony of the officers involved.

The testimony from the government's witnesses establishes a number of inconsistencies as well as logical contradictions in describing the events that led up to the actual stop of the vehicle in question.  It is also this Court's opinion that the testimony of Detectives Torre and Doctor and of Officer Wright establishes a reckless disregard for the truth on the part of Special Agent Kasprzyk.  According to Detective Torre, "Special Agent Kasprzyk advised [him] that while in the middle of this gun operation, the informant **observed** what he thought was a drug transaction, from (sic) someone he [the CS] knew and identified by first name as Dwayne.  He identified him

also as being in a silver Lincoln and that he **observed what he thought was a drug transaction.**" (T. 140, 155) (emphasis added).  Special Agent Kasprzyk further stated that "the informant said he knows this guy, **he just got plugged**" which Detective Torre knew to mean that the individual "just got served some drugs." (T. 157) (emphasis added).

Detective Doctor testified that Special Agent Kasprzyk stated in regard to the individual in the Lincoln Town Car on Rodney Street, "that there's **a good possibility that the person or individual over there at that house is either getting narcotics or giving narcotics.**" (T. 251-252) (emphasis added).

Officer Wright testified that Special Agent Kasprzyk "put over DEA radio that - - information received from a CS that there was a silver Lincoln parked on Rodney Street, and that silver Lincoln was over there - - **the driver was over there seeing the source of supply to obtain an unknown amount of narcotics.**" (T. 171-172) (emphasis added).

The transcript of the CS's communication to Special Agent Kasprzyk on February 15, 2005 (Government Exhibit 4) clearly establishes that the CS did **not** "observe" a "drug transaction" involving the defendant; that the CS did **not** say that the defendant "just got plugged;" that the CS did **not** say "that there's a good possibility that the person or individual over there at that house is either getting narcotics or giving

narcotics."  What the transcript does unequivocally establish is that the CS was doing nothing more than speculating as to what might be occurring at the Rodney Street location as evidenced by his actual statements: "**I bet** if he over there he plugging from him right now;" **I bet** you he's plugging from him right now; he **probably**, he **probably** just plugged from Reece. . . ."  It is also pointed out that all the CS did "observe" was "Dwayne sitting in the car right in front" of the house on Rodney Street.  (Government Exhibit 4) (emphasis added).  He did not see him enter or leave the house in question; nor did he observe anyone come from the house to the silver Lincoln parked in front of it.  What the CS observed and reported to Special Agent Kasprzyk did not constitute "enough information on which to reasonably order a person to stop."  *United States v. Swindle, supra* at 569.

        If the "plan" was merely to stop and obtain the identification of the driver of the silver Lincoln Town Car, as testified by Special Agent Kasprzyk, Detectives Torre and Doctor and Officer Wright (T. 69, 99, 105, 141-143, 157, 189, 193, 195, 255, 279, 282, 284), that could have been easily accomplished when Detective Doctor and Officer Wright "observed [the] silver Lincoln parked in the parking lot" in the Central Park Plaza and kept it under surveillance until the driver of the vehicle entered it. (T. 173-174, 252-253, 254).  However, for reasons unknown, they chose not to do that and instead radioed that the Lincoln was moving away from the plaza.  It is at this point that numerous discrepancies in the government's proof begin to unfold.

Officer Sanak testified that he "was asked by [his] lieutenant to stop a vehicle and identify the driver." (T. 5, 32). Lieutenant Healy provided a "description of the vehicle and also the license plate number to him." (T. 9) (*See* Government Exhibit 1A). Officer Sanak first encountered the silver Lincoln Town Car "as [he] was heading up to the Central Park Plaza area, [he] was travelling west on East Amherst Street at which time [he] made a left-hand turn travelling **south** on Holden Avenue. As [he] turned the corner on Holden, that's when [he] observed this gray Lincoln travelling **north** on Holden." (T. 15) (emphasis added). Officer Sanak testified that he "was travelling **south** on Holden; the gray Lincoln was travelling **north**; [they] passed each other. As [he] passed this gray Lincoln, [he] made a left-hand turn and turned into a parking lot of the apartment building there. As [he] was turning around in the parking lot, ready to exit the parking lot, [he] observe[d] the vehicle still travelling **north** on Holden coming up to the intersection of East Amherst with its left directional light on. **As [he] was pulling out of the parking lot, [he] did observe that [the defendant] failed to come to a complete stop at the stop sign indicated there.**" (T. 16) (emphasis added). He was "possibly 30 to 50 yards, somewhere around there" away from the Lincoln when he observed the traffic violation. (T. 17). He followed the Lincoln for "approximately two blocks and pulled it over at Amherst and Parker. (T. 17). Officer Sanak "was directly behind the [Lincoln] with [his] police vehicle" when he pulled the Lincoln over by turning on his lights. Officer Sanak testified that his marked partrol car was a "low profile car" in that it did **not** "have any roof lights on or outside lights on [his] vehicle." (T. 33) (emphasis added). The defendant "immediately pulled over. (T. 17-18). Officer Sanak

never radioed that the defendant ran a stop sign.  He merely reported to the dispatcher

that he had made a traffic stop.  (*See* Government Exhibit 1A) (T. 37).


Detective Doctor and Officer Wright testified that they followed the Lincoln

after it pulled out of the plaza parking lot.  (T. 174-175).  Detective Doctor testified that

he observed the Lincoln exit the plaza and "head[ ] **north** on Holden."  (emphasis

added).  Officer Wright testified that he and Doctor observed the Lincoln leave the plaza

parking lot and "travel[ ] up towards Holden" where they "let it make a right on Holden"

and they "made a right on Holden.  After the police car passed [them], [they] started

following the car **northbound** on Holden."  (T. 174) (emphasis added).


Officer Wright further testified that his car was "actually behind [the]

uniformed (sic) police car . . . which was following the silver Lincoln, so [they] were about

two cars behind the silver Lincoln."  (T. 175).  On cross-examination, Officer Wright

testified that the patrol car passed them travelling north on Holden and that he did not

see the patrol car turn around at any point and that he did not see it travelling **south** on

Holden.  (T. 192) (emphasis added).


Detective Doctor testified that he observed the silver Lincoln pull out of the

plaza parking lot and "head[ ] north on Holden" and then observed a "marked unit pull[ ]

behind the silver Lincoln."  (T. 254).  He and his partner, Officer Wright, "positioned

[themselves] a couple of car lengths behind the marked unit also behind the silver

Lincoln."  (T. 254).  This car was "approximately 100 yards" behind the silver Lincoln.
 (T. 255).

On cross-examination, Detective Doctor testified that he did not see the
marked police car come towards them at one point and he did not see the marked
vehicle do a U-turn on Holden.  (T. 278).  Detective Doctor also testified that this marked
police car had "overhead lights" on it that "protruded above the roof of the car."  (T. 280).

In response to this Court's questions, Detective Doctor described the
alignment of the vehicles on Holden Street at the time of the alleged V&T violation as
being as follows: "(1) the silver Lincoln, (2) one or two citizen's vehicles, (3) the marked
police car, (4) one or two more citizen's vehicles and (5) his unmarked vehicle."  (T. 315-
316).  The distance between his vehicle and the silver Lincoln at the time of the alleged
violation was "100 yards."  (T. 316).

Presumably, if Wright and Doctor followed the Lincoln from the Central
Park Plaza onto Holden, they would have been travelling north on Holden as testified to
by Officer Sanak.  Since Sanak was travelling south on Holden when he first saw the
silver Lincoln, it is reasonable to assume that he would have been coming towards the
vehicle driven by Wright and Doctor.  Furthermore, if Wright and Doctor positioned
themselves behind this marked patrol car, it is reasonable to conclude that they would
have seen it make the turn into the parking lot on Holden so as to change its direction on
Holden from south to north and pursue the Lincoln in order for them to end up behind

-32-

the marked patrol car on Holden which allegedly was now behind the Lincoln.


What is even more perplexing is Detective Doctor's testimony as to the alignment of cars at the time the Lincoln allegedly rolled through the stop sign. Detective Doctor testified that when he observed the Lincoln roll through the stop sign, the alignment of vehicles was as follows: (1) "the silver Lincoln, (2) one or two citizen's vehicles, (3) the marked police car, (4) one or two more citizen's vehicles, and (5) his unmarked vehicle."  (T. 315-316).


This testimony of Detective Doctor is totally contradicted by the testimony of Officer Sanak in that Officer Sanak testified that he was in the parking lot on Holden, having completed his U-turn, and in the process of "**pulling out of the parking lot**" when he "**observ[ed] that [the defendant] failed to come to a complete stop at the stop sign indicated there.**"  (T. 16) (emphasis added).  Furthermore, I have serious doubts that one would be able to observe a vehicle 100 yards away with approximately five motor vehicles between it and the vehicle of the observers "roll through a stop sign."


It is also pointed out that Officer Sanak's marked patrol car did not have overhead or roof lights as claimed by Detective Doctor (T. 280) because Officer Sanak testified that his patrol car was a "low profile [police] car" in that it did not "have any roof lights on or outside lights on [his] vehicle."  (T. 33).

-33-

The claims by Detectives Torre and Doctor and Officer Wright that they were concerned for the "safety" of Officer Sanak, and thus the reason for approaching the silver Town Car, rings hollow. All of the officers were in radio communication with one another, and as Government Exhibit 1 establishes, Officer Motley radioed, "O.K. I'm right behind you," meaning he was right behind Officer Sanak when Sanak was seeking the silver Lincoln Town Car. When Officer Sanak stopped the silver Town Car, he radioed that he had "a car with me on it, I'm all set here." (Government Exhibit 1, p. 3). The "car with [him]" was Motley's car.

Officer Sanak testified that he had "looked in the back window [and] the front window [of the Lincoln and he] could see the entire inside of the car." The driver "was polite, he was courteous, but seemed a little nervous." (T. 21). However, nothing occurred to cause alarm on the part of either Officer Sanak or Officer Motley who was also on the scene at the time. Officer Sanak had obtained the driver's license and had returned to his patrol car and ran a computer check on the license and wrote up a traffic summons since he was not going to arrest the driver. (T. 141).

As the United States Supreme Court has stated:

> The threat to officer safety from issuing a traffic citation, however, is a good deal less than in the case of a custodial arrest . . . .   A routine traffic stop, on the other hand, is a relatively brief encounter and is more analogous to a so-called Terry stop . . . than to a formal arrest.

*Knowles v. Iowa*, 525 U.S. 113, 117 (1998); *Berkemer v. McCarthy*, 468 U.S. 420, 439

(1984).

Assuming, *arguendo*, that there was a traffic violation, *i.e.*, failure to stop at the stop sign, Officer Sanak had basically completed the law enforcement procedure for such violation before Detectives Torre and Doctor, Special Agent Kasprzyk, and Officer Wright began their interrogation of the defendant and the search of the defendant and his vehicle.  Since Officer Sanak had decided to issue a traffic summons in lieu of an arrest for the V&T violation, neither he nor the other officers were authorized to conduct a full search of the defendant and/or his vehicle under the Fourth Amendment.  Once the defendant had been stopped for the V&T violation and the traffic summons prepared by Officer Sanak citing such violation, "all the evidence necessary to prosecute that offense had been obtained.  No further evidence [of a stop sign violation] was going to be found either on the person of the offender or in the . . . compartment of the car."  *Knowles v. Iowa, supra* at 118.

The objective of the aforesaid "plan" had been accomplished, *i.e.*, the identity of the driver of the silver Lincoln Town Car, when Officer Sanak obtained the driver's license.  It is pointed out that notwithstanding that the "identity" of the driver was the plan objective, Detective Torre never stopped to look at the driver's license that Officer Sanak had in his hand when Torre approached him.  (T. 159).  Instead, he and Detective Doctor decided "to go talk to the driver and see what's going on" with the intention of "just ask[ing] him a few questions, see where he's coming from and what

he's doing, **try to investigate a little.**" (T. 257) (emphasis added).  The purpose for this

further "**investigation**" was to "**determine later it could be a case for [them] later on**

**(sic)**" since "this was good information from a CS that [they] had and [they] wanted to

act on it.  (T. 289) (emphasis added).  They were also "**try[ing] to get some more**

**information out of [the defendant to] see if he was lying to them**.  (T. 288-289)

(emphasis added).  As the United States Supreme Court has admonished,

> We cannot sanction stops justified only by the generalized
> and ever present possibility that interrogation and
> inspection may reveal that any given motorist has
> committed some crime.

*City of Indianapolis v. Edmond, supra* at 44.


The defendant was confronted by "five to six plain clothes officers" with "a

couple of officers on one side of the car" and "couple of officers talking with him through

the driver side window," and this confrontation lasted for "ten, fifteen minutes."  (T. 26-

27).  During this period, the defendant was merely "sit[ting] in the driver (sic) seat looking

straight ahead" and exercising his Fifth Amendment right by remaining silent.  (T. 145-

146).


The testimony of Special Agent Kasprzyk on this issue is also very

disturbing to the Court, which testimony is as follows:

> Q.     And you say he seemed disinterested.  In other
>        words, he was on the phone talking to his attorney,
>        right?

A.    That's correct

Q.    Okay.  And he was more interested in talking to his attorney than he was in talking to the police officers, right?

A.    He seemed disinterested.  When I asked him questions and he wouldn't respond to my questions, that's disinterested.  **When you have a police officer or agent from law enforcement asking you questions and you're not willing to answer those questions, that's disinterested.  If you're on the phone with your attorney, at that point you should hang up or put the call on hold and talk to the law enforcement official who is asking questions.  That's what I mean by disinterested**.

Q.    So he shouldn't be consulting with an attorney, he should be talking just to you?

A.    When we're asking him questions, yes, he should be talking to us because we are there asking questions and conducting an investigation.

(T. 108-109) (emphasis added).

"[A] person stopped is not obliged to answer [questions], answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation."  *Terry v. Ohio*, 392 U.S. 1, 34 (1968) (concurring opinion of Justice White).  This principle was expressly reiterated by the Second Circuit Court of Appeals in *Diamondstone v. Macaluso*, 148 F.3d 113 (2d Cir. 1998) wherein the Court stated:

To be sure, courts have long held that the privilege against self-incrimination not only protects the individual against being involuntarily called as a witness against himself in a

-37-

> criminal prosecution but also privileges him not to answer
> official questions put to him in any other proceeding, civil or
> criminal, formal or informal, investigatory or adjudicatory,
> where the answers might incriminate him in future criminal
> proceedings. *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct.
> 316, 39 L.Ed.2d 274 (1973).

*Id*. at 122.

The exercise of one's Fifth Amendment right to remain silent cannot be reduced to a characterization of being "disinterested." Further, the defendant was apparently following the advice of his lawyer whom he had just talked to on his cell phone as evidenced by his statements to Detectives Doctor and Torre wherein he stated, "My lawyer says I don't have to do anything" (T. 149-150) and that his attorney had "advis[ed] him not to get out of the vehicle or not let [them] search him or his vehicle." (T. 262).

The testimony of Detective Doctor epitomizes what this Court finds to be the true intent of the officers in confronting the defendant on February 15, 2005 in describing what the purpose of approaching the defendant was after having been stopped by Officer Sanak, to wit, "to investigate a little" and to "determine later it could be a case for [them] later on (sic)" and to "try to get some more information out of [the defendant to] see if he was lying to them." (T. 257, 288-289). In essence, the officers were utilizing this alleged traffic stop with either a hope or suspicion that the defendant "may subsequently do something that violates the law." As the Second Circuit Court of Appeals has ruled:

-38-

> Thus, a police officer may not stop a [motorist] simply
> because she suspects that the [motorist] will react to her
> questioning by behaving in a disorderly manner.  And a
> citizen is not subject to arrest based on the suspicion that
> he might respond by resisting arrest.  A *fortiori*, a stop may
> not be based on the belief that the suspect, if stopped, may
> react by doing something that is itself no more than
> evidence of a violation of the law.

*Diamondstone v. Macaluso, supra* at 125.

Since the task force officers had neither probable cause to believe nor reasonable suspicion that the defendant was violating the law so as to warrant their ten to fifteen minute confrontation of the defendant, I find that they violated the defendant's right to be free from an unlawful search and seizure when they forcibly removed him from his vehicle and searched his person and the vehicle.

The claims by Detectives Torre and Doctor that the actions or inaction of the defendant constituted "obstruction of justice" (sic) or "obstruction of government administration" are without merit.  Section 195.05 of the New York Penal Law states that:

> A person is guilty of obstructing governmental
> administration when he intentionally obstructs, impairs or
> perverts the administration of law or other governmental
> function or prevents or attempts to prevent a public servant
> from performing an official function, by means of
> intimidation, physical force or interference, or by means of
> any independently unlawful act, or by means of interfering,
> whether or not physical force is involved, with radio,
> telephone, television or other telecommunications systems
> owned or operated by the state, or a county, city, town,

> village, fire district or emergency medical service or by
> means of releasing a dangerous animal under
> circumstances evincing the actor's intent that the animal
> obstruct governmental administration.
>
> Obstructing governmental administration is a class A
> misdemeanor.

The act of the defendant in exercising his Fifth Amendment rights on

February 15, 2005, as set forth above, did not constitute a violation of Section 195.05 of

the New York Penal Law.

Section 205.30 of the New York Penal Law states that:

> A person is guilty of resisting arrest when he intentionally
> prevents or attempts to prevent a police officer or peace
> officer from effecting an **authorized** arrest of himself or
> another person.  (emphasis added).

The holding of the New York Supreme Court, Appellate Division in

*People v. Lupinacci*, 191 A.D.2d 589, 590, 595 N.Y.S.2d 76 (2d Dept. 1993) is most

applicable to the case at bar wherein the court stated:

> As charged in the underlying indictment, . . . the defendant
> was alleged to have struggled with the police to avoid being
> handcuffed, and walked away from the arresting officer,
> ignoring orders to stop.  However, a defendant may not be
> convicted of obstructing governmental administration or
> interfering with an officer in the performance of an official
> function unless it is established that the police were
> engaged in authorized conduct (*see, People v. Vogel*, 116
> Misc 2d 332; *People v. Simon*, 145 Misc 2d 518; *People v.
> Stumpp*, 129 Misc 2d 703, *affd* 132 Misc 2d 3).  In the
> instant case, the police were not authorized to attempt to

-40-

detain the defendant because, under the circumstances,
they did not possess a reasonable suspicion that the
defendant was involved in criminal activity (*cf., People v.
Martinez*, 80 NY2d 444; *People v. De Bour*, 40 NY2d 210).
Thus, the defendant was free to walk away, and any
attempt to detain him was unauthorized.

## **CONCLUSION**

It is therefore the RECOMMENDATION of this Court that the defendant's

motion to suppress the evidence seized on February 15, 2005 be GRANTED.

Ever since its inception, the rule excluding evidence seized
in violation of the Fourth Amendment has been recognized
as a principal mode of discouraging lawless police conduct.
See Weeks v United States, 232 US 383, 391-393, 58 L Ed
652, 655, 656, 34 S Ct 341, LRA 1915B 834 (1914). Thus
its major thrust is a deterrent one, see Linkletter v. Walker,
381 US 618, 629-635, 14 L Ed 2d 601, 608-612, 85 S Ct
1731 (1965), and experience has taught that it is the only
effective deterrent to police misconduct in the criminal
context, and that without it the constitutional guarantee
against unreasonable searches and seizures would be a
mere "form of words." Mapp v. Ohio, 367 US 643, 655, 6 L
Ed 2d 1081, 1090, 81 S Ct 1684, 84 ALR2d 933 (1961).
The rule also serves another vital function - - "the
imperative of judicial integrity." Elkins v. United States, 364
US 206, 222, 4 L Ed 2d 1669, 1680, 80 S Ct 1437 (1960).
Courts which sit under our Constitution cannot and will not
be made party to lawless invasions of the constitutional
rights of citizens by permitting unhindered governmental
use of the fruits of such invasions. Thus in our system
evidentiary rulings provide the context in which the judicial
process of inclusion and exclusion approves some conduct
as comporting with constitutional guarantees and
disapproves other actions by state agents. A ruling
admitting evidence in a criminal trial, we recognize, has the
necessary effect of legitimizing the conduct which produced
the evidence, while an application of the exclusionary rule

withholds the constitutional imprimatur.

\*   \*   \*

Nothing we say today is to be taken as indicating approval of police conduct outside the legitimate investigative sphere.  Under our decision, courts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires.  When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials.

*Terry v. Ohio*, 392 U.S. 1, 12-13, 15 (1968).

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v.*

*Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

/s/ H. Kenneth Schroeder, Jr.

_____
**H. KENNETH SCHROEDER, JR.
United States Magistrate Judge**

**DATED:     Buffalo, New York
          May  9, 2006**